ALLISON–KESLEY AG CENTER,
INC., Plaintiff,

v.

Scott HILDEBRAND and Hildebrand
Brothers Farms, Defendants.

ALLISON–KESLEY AG CENTER,
INC., Appellant,

v.

FIRST STATE BANK OF GREENE,
Iowa, Defendant,

and

Farmers Cooperative Elevator
Company, Appellee.

No. 90–1090.

Supreme Court of Iowa.

May 13, 1992.

Rehearing Denied June 18, 1992.

Roger L. Sutton of Sutton Law Office, Charles City, for appellee.

Bruce Johnson of Gamble, Riepe, Webster, Davis & Green, Des Moines, for appellant.

Considered by McGIVERIN, C.J., and CARTER, NEUMAN, SNELL, and ANDREASEN, JJ.

SNELL, Justice.

The appellee, Farmers Cooperative Elevator Company (hereinafter "Farmers Coop"), seeks further review of a court of appeals decision that reversed a district court decision which found Farmers Coop to be a holder in due course with respect to $218,000 worth of United States government payment-in-kind (PIK) certificates. The appellant, Allison–Kesley Ag Center, Inc., contends that Farmers Coop took possession of the PIK certificates and subsequently honored a draft issued in payment therefor with "actual or constructive knowledge" that the PIK certificates had been obtained from Allison–Kesley by fraud; consequently, Allison–Kesley argues that its right, title and interest in the PIK certificates is superior to any right, title or interest claimed by Farmers Coop. Allison–Kesley also maintains that the district court erroneously failed to allow it to amend the complaint against Farmers Coop to include breach of an implied-in-fact contract, the nature of which will be described below. We conclude that the district court's decision was sound in each of these respects, and, therefore, vacate the decision of the court of appeals and reinstate the district court's decision.

I. *Background Facts.*

On Saturday, October 3, 1987, at approximately 9:00 a.m., Scott Hildebrand appeared at Allison–Kesley's office in Allison, Iowa. During the previous week he had indicated to Gary Abbas, Allison–Kesley's general manager, that he wanted to buy approximately $200,000 worth of PIK certificates to redeem government corn. In their earlier discussion, Abbas told Hildebrand that he would have to pay 109% of the face amount of these certificates. Accordingly, on the morning of October 3, Hildebrand presented Abbas with a "certified draft" drawn on the International Credit Exchange, Acapulco, Mexico, in the amount of $218,000. In exchange, Abbas gave Hildebrand PIK certificates with a total face value of $199,999.96.

Shortly after leaving Allison–Kesley's office, Hildebrand, his brother, Skipper, and his father, Quentin, appeared at Farmers Cooperative in Marble Rock, Iowa. The Hildebrands offered to sell the recently purchased PIK certificates to C.T. Moser, Farmers Coop's general manager, for 106% of the certificates' face value. Moser countered with an offer of 105% of face value, and the Hildebrands accepted. The certificates were thus sold for 105% of their face value, or $210,062.95, which was $7937.05 less than they had been purchased for earlier that day. Moser issued a check in the amount of $210,062.95, payable to Hildebrand Brothers. Scott Hildebrand said that he was going to take the check to the First State Bank of Greene, Iowa.

At the time of the Hildebrand sale, Moser examined the certificates and noted that they had not expired and were bearer certificates. However, after the Hildebrands had left and the transaction was complete, Moser further examined the certificates and noted that all of them had been endorsed by either Farmers Coop of Iowa Falls or Allison–Kesley on either October 2 or October 3 and that Farmers Coop's endorsement was stamped rather than handwritten. This caused Moser to become sus-

picious of a possible theft so he called the Iowa Falls branch office and spoke with Carroll Spangler. During the course of Moser's conversation with Spangler, which took place approximately one hour after the Hildebrands had left, Moser was told that the certificates were "legitimate" and had been sold to Allison–Kesley on October 2, 1987, for 108% of face value. Later the same morning, Spangler telephoned Moser and stated that he had spoken with Abbas, who indicated that the Hildebrands had purchased the certificates from Allison–Kesley earlier that morning for 109% of face value. Shortly before noon of the same day, Abbas telephoned Moser and expressed concern about the draft given to him by the Hildebrands as payment for the certificates. In addition, Abbas requested that Moser stop payment on the check that Farmers Coop had issued to Hildebrand Farms. Since both Farmers Coop and the bank closed at noon on Saturday, Moser did not speak with anyone at the bank on Saturday, October 3.

On the following Monday, October 5, Moser had further discussions with Abbas and Dan Castle, the vice president for the First State Bank of Greene, Iowa. At their meeting, Castle indicated that the Hildebrands—Scott, Skipper and Quentin—had appeared at the bank on Saturday, October 3, at which time they requested payment in cash for the full amount of the check they had received from Farmers Coop. Castle declined to cash the check for its full amount, but did pay out $50,000–$10,000 in cash, a $25,000 bank draft payable to Smith Implement and a $15,000 draft payable to Scott Hildebrand. Castle kept the remaining funds on deposit. At the conclusion of their October 5 meeting, Moser stopped payment on the Farmers Coop check as was requested by Abbas. As a consequence, the Hildebrands contacted Moser on the same day to express their displeasure with the stop-payment order. Moser responded that the stop payment would be lifted when the International Credit Exchange Draft given by the Hildebrands finally cleared. At a later conversation on the same day, Scott Hildebrand threatened to initiate a lawsuit against Farmers Coop if the stop payment was not lifted immediately.

Beginning on or about October 6, 1987, Moser began having discussions with Maurice Hyde, vice president of United Suppliers, Inc., the parent company of Allison–Kesley. Hyde told Moser that the International Credit Exchange Draft was being held as evidence and was not being processed for payment pursuant to advice from United Supplier's counsel. Within a week thereafter, Moser received a copy of an "urgent notice" issued by the Federal Reserve Bank of Chicago concerning drafts drawn on the International Credit Exchange of Acapulco, Mexico. The notice warned its readers to beware of fraudulent checks drawn on the International Credit Exchange, which does not exist. Moser forwarded a copy of this notice to both Hyde and Castle.

On October 21, 1987, after consultation with Farmers Coop's attorney, Moser decided to lift the stop-payment order and borrow money to cover the proceeds of its outstanding check. Farmers Coop's attorneys attempted, albeit unsuccessfully, to contact Allison–Kesley's attorney prior to lifting the stop-payment order. On October 22, funds were wire-transferred to make good on the Farmers Coop draft, and the stop-payment order was lifted.

Upon receiving notice that the stop-payment order was to be lifted, the First State Bank of Greene covered its earlier cash disbursements totaling $50,000. The balance of the check proceeds were disbursed as follows: $1000 cash to Skipper Hildebrand; $6500 was deposited in Hildebrand Brothers Farms checking account; $15,000 was wired to Scott Hildebrand; a certificate of deposit was purchased for $72,000; and the balance, $65,562.95, was deposited in a savings account. Most of the funds in the savings account were disbursed on October 23 when Skipper Hildebrand withdrew $7500 in cash and acquired eight bank drafts totaling $50,000. Nevertheless, on October 27, Allison–Kesley, through a court order, was able to attach funds on deposit with the bank, totaling approximately $85,000.

As a consequence of the foregoing series of events, Allison–Kesley initiated lawsuits against Scott Hildebrand, Skipper Hildebrand, Hildebrand Brother's Farms, Farmers Coop, and other parties not relevant to the dispute herein. The claims lodged against the Hildebrands have resulted in judgments for $218,000 against Scott, Skipper and Hildebrand Brothers Farms as well as exemplary damages totaling $20,000 against Scott and Skipper.

Allison–Kesley's claim against Farmers Coop is essentially one of conversion: Allison–Kesley alleges that Farmers Coop "took possession of the PIK certificates and released payment of the $210,000 check [issued to the Hildebrands] with knowledge of the fraud" perpetrated against Allison–Kesley by the Hildebrands. The district court concluded that inasmuch as Farmers Coop "acquired the certificates as a good faith purchaser for value," Farmers Coop cannot be guilty of conversion. The district court chose to characterize Farmers Coop as a "good faith purchaser for value." *See* Iowa Code § 554.2403. However, since the PIK certificates are negotiable instruments issued by the United States government, it seems more appropriate to utilize a holder-in-due-course analysis. This approach was adopted by the parties in their briefs, and it will produce the same result as a good-faith-purchaser-for-value analysis under Iowa Code section 554.2403.

## II. *Farmers Coop as a Holder in Due Course.*

■ Allison–Kesley's first contention is that the district court's determination regarding Farmers Coop's holder-in-due-course status was not supported by substantial evidence. Our review of this assertion is for errors at law. Iowa R.App.P. 4. "[F]indings of fact by the trial court in [a] law case are the equivalent of a jury verdict. If supported by substantial evidence and justified as a matter of law, they are binding on us." *Gere v. Council Bluffs Community Sch. Dist.*, 334 N.W.2d 307, 309 (Iowa 1983); Iowa R.App.P. 14(f)(1). We have defined substantial evidence as follows:

A finding of fact is supported by substantial evidence if the finding may reasonably be inferred from the evidence. In evaluating sufficiency of evidence, we view it in its light most favorable to sustaining the court's judgment. We need only consider evidence favorable to the judgment, whether or not it is contradicted.

*Briggs Transp. Co. v. Star Sales Co.*, 262 N.W.2d 805, 808 (Iowa 1978). Thus, "[w]e do not weigh the evidence; we only decide if there is a proper basis upon which the trial court *could* find as it did." *Arbie Mineral Feed Co. v. Nissen*, 179 N.W.2d 593, 595 (Iowa 1970).

Prior to discussing the issue of substantial evidence, we must first consider the requirements for attaining holder-in-due-course status. To become a holder in due course of a negotiable instrument—in this case, a PIK certificate—one must, among other things, give "value" in exchange for the negotiable instrument one receives. Iowa Code § 554.3302(1)(a) (1991). Significantly, value is defined to include the giving of a negotiable instrument in return for the negotiable instrument that one receives. Iowa Code § 554.3303(c). "The negotiable instrument is value because it carries the possibility of negotiation to a holder in due course, after which the party who gives it cannot refuse to pay." Iowa Code § 554.3303 comment 6.

■ In addition to giving "value," one must take the instrument "without notice of any defense against or claim to it on the part of any person." Iowa Code § 554.3302(1)(c). The proper time for determining whether the recipient of an instrument has notice of a claim or defense is the time of negotiation of the instrument to the holder. *Mecham v. United Bank of Arizona*, 107 Ariz. 437, 442, 489 P.2d 247, 252 (1971) (critical time for notice is when party comes into possession as a holder); *Kroh v. Pronto Petroleum Co.*, 536 P.2d 860, 862 (Colo.Ct.App.1975) (same); *Hatton v. Money Lenders & Assocs.*, 127 Ill.App.3d 577, 580, 82 Ill.Dec. 826, 829, 469 N.E.2d 360, 363 (1984) (same); *Sullivan v. United Dealers Corp.*, 486 S.W.2d 699, 701 (1972)

(same); *Weast v. Arnold,* 299 Md. 540, 563, 474 A.2d 904, 916 (1984) (same); *Lynnwood Sand & Gravel, Inc. v. Bank of Everett,* 29 Wash.App. 686, 691, 630 P.2d 489, 492 (1981) ("Subsequent notice of infirmities in the instrument has no effect upon the rights of a holder in due course, absent a showing of bad faith."); J. White & R. Summers *Uniform Commercial Code* § 14–2, at 696 (Notice after value has been given "does not deprive [the holder] of holder-in-due-course status. If such notice coming after possession and giving of value deprived the holder of his holder-in-due-course status, the status would have no value at all.").

■ Based on the evidence presented at trial, the district court could have reasonably concluded that Moser, the Farmers Coop representative who conducted the Hildebrand transaction at the time he bought the PIK certificates, neither had actual knowledge nor reason to know of the fraud perpetrated by the Hildebrands. *See* Iowa Code § 554.1201(25) (defining notice for purposes of Uniform Commercial Code). On the contrary, it was not until after the Hildebrands had left and Moser further examined the certificates that he became suspicious of possible wrongdoing, at which time Moser initiated an investigation that ultimately led to a discovery of the Mexican draft's fraudulent origin. We also conclude that, based on the trial record, the district court could reasonably conclude that Farmers Coop took the PIK certificates for value since they issued a negotiable instrument—namely. their check—in exchange for the PIK certificates. *See* Iowa Code § 554.3104 (defining a negotiable instrument to include a check).

There is substantial evidence in the record to support the district court's determination that Farmers Coop took the PIK certificates for value, in the form of a negotiable instrument, and without notice of any claim to the certificates on the part of Allison–Kesley or any other entity. Accordingly, the court's determination that Farmers Coop was a holder in due course is supported by substantial evidence. *See*

Iowa Code § 554.3302 (defining a holder in due course).

III. *Allison–Kesley's Application to Amend Their Initial Complaint.*

■ In Allison–Kesley's final asserted error, it contends that the district court improperly denied its application to amend the initial complaint against Farmers Coop. The application to amend, which was filed over three months after trial and approximately thirty days after submission of written briefs and arguments, claims that Farmers Coop breached an implied-in-fact contract with Allison–Kesley in which they agreed not to lift the stop-payment order in exchange for an indemnification agreement. The district court denied the application on the basis that it was "untimely."

■ Iowa Rule of Civil Procedure 88 is relevant to our analysis.

A party may amend a pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is required and the action has not been placed upon the trial calendar, the party may so amend it at any time within twenty days after it is served. Otherwise, a party may amend a pleading only by leave of court or by written consent of the adverse party. Leave to amend, including leave to amend to conform to the proof, shall be freely given when justice so requires.

Elaborating upon the rule 88 standard for amendments, we have said:

Allowance of an amendment to a pleading is the rule and denial the exception, although an amendment is not permissible which will substantially change the issue. Additionally, a trial court has considerable discretion as to whether an appropriate request for leave to amend should be granted or denied and we will reverse only where a clear abuse of discretion is shown.

*M–Z Enter. Inc. v. Hawkeye Sec. Ins. Co.,* 318 N.W.2d 408, 411 (Iowa 1982). Thus, the timing of an attempt to amend is not the determinative factor; instead, the critical determination is whether the proposed amendment substantially changes the is-

sues before the court. *Kitzinger v. Wesley Lumber Co.,* 419 N.W.2d 739, 741 (Iowa App.1987).

The relevant "issues" are established either by the initial pleadings, *see Davis v. Ottumwa Young Mens Christian Assoc.,* 438 N.W.2d 10, 14–15 (Iowa 1989), or by those matters on which the parties have "consented" to litigate, either expressly or impliedly. *See* Iowa R.Civ.P. 249. Allison–Kesley contends that their proposed amendment falls into the latter category, and thus they are entitled to amend their pleadings under Iowa Rules of Civil Procedure 88, 106, and 249, all of which provide for amendment of the pleadings so as to conform with the evidence presented.

■ After considering the trial transcript, we note that evidence concerning the existence vel non of an implied-in-fact contract between Allison–Kesley and Farmers Coop was given by several witnesses, including Moser, Abbas, and Maurice Hyde, president of Farmers Coop's parent company. We also note that allowance of a conforming amendment "is the rule and denial the exception." *B & B Asphalt Co. v. T.S. McShane Co.,* 242 N.W.2d 279, 284 (Iowa 1976). Finally, amendments to conform to the proof are acceptable at any time, even after judgment has been rendered. Iowa R.Civ.P. 106; *see also Smith v. Village Enter., Inc.,* 208 N.W.2d 35, 37 (Iowa 1973).

■ "Nevertheless, a trial court has considerable discretion in ruling on a motion for leave to amend, and we will reverse only when a *clear* abuse of discretion is shown." *Id.* (emphasis added); *Atlantic Veneer Corp. v. Sears,* 232 N.W.2d 499, 503 (Iowa 1975). More specifically, when the movant seeks to amend based upon trial testimony that the movant knew or should have known about beforehand, amendments that might well have otherwise been allowed earlier in the course of the proceedings may properly be denied by the district court judge. *Mora v. Savereid,* 222 N.W.2d 417, 422–23 (Iowa 1974) (denying an amendment at the close of evidence when the trial testimony presented "no surprises"); *Trask v. Gibbs,* 200 N.W.2d 565,

568–69 (Iowa 1972) (same); *Salter v. Freight Sales Co.,* 357 N.W.2d 38, 43 (Iowa App.1984). In the present dispute, Allison–Kesley knew or should have known as of the inception of their suit that Hyde and Abbas were prepared to offer testimony that they had secured an agreement with Moser whereby Farmers Coop would not release their stop payment in exchange for a promise of indemnification by Allison–Kesley. Under these circumstances, we are unable to conclude that the district court's denial of Allison–Kesley's application for amendment, filed three months after the evidence was closed and thirty days after the submission of final arguments and briefs, was an abuse of discretion.

Accordingly, the decision of the court of appeals is hereby vacated, and the decision of the district court is affirmed.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.