**Lee D. SCOTT, d/b/a Click–It, Appellee,**

v.

**GRINNELL MUTUAL REINSURANCE COMPANY and Grinnell Infosystems, Inc., Appellants.**

**No. 00–1577.**

Supreme Court of Iowa.

Nov. 14, 2002.

**558**

John B. Grier of Cartwright, Druker & Ryden, Marshalltown, and Dennis G. Day, Grinnell, for appellants.

Mark W. Fransdal of Redfern, Mason, Dieter, Larsen & Moore, P.L.C., Cedar Falls, for appellee.

NEUMAN, Justice.

This appeal concerns an alleged breach of contract for the purchase of computer programming services. Plaintiff's petition rested solely on a theory of *implied contract* for the value of services rendered. At trial, however, plaintiff was permitted—over defendants' objection—to amend to conform to proof of breach of an *express contract.* The jury's verdict premised on this new theory awarded plaintiff reliance damages totaling $100,000, and defendants now appeal the judgment entered on that verdict.

Because the evidence pertinent to damages recoverable under plaintiff's original theory differs so markedly from the proof required for recovery under the theory submitted to the jury, and the amendment was allowed at the close of all the evidence, we agree with defendants' claim on appeal that the judgment for plaintiff cannot stand. We therefore vacate a contrary decision by our court of appeals, reverse the judgment entered by the district court, and remand for new trial.

## I. Background Facts.

Plaintiff, Lee Scott, is a self-employed computer programmer who operated a business in Grundy Center, Iowa, known as "Click–It." Defendants, Grinnell Mutual Reinsurance Company and Grinnell Infosystems, Inc., are corporations headquartered in Iowa which are engaged in the sale and marketing of insurance products.[1] Mike Ward, president of Grinnell, contacted Scott about writing a computer program that could be used by Grinnell-affiliated county mutual insurance companies to quote comparative rates for fire and wind insurance. Ward was particularly interested in providing such a program

---

1. By stipulation, the defendants have been treated as one entity throughout this litigation and will be identified on appeal simply as "Grinnell."

to Flom Mutual Insurance Company of Minnesota. Scott began working on the program in late fall, 1996, with an estimated completion date of February 1997.

As with virtually all breach-of-contract cases, the controversy before us centers on the nature and scope of the parties' agreement. During their initial negotiations, both Scott and Ward recognized that a joint venture held promise for marketing such programs throughout the Midwest. But their perspectives on the Flom project differed markedly. Scott was willing to build the program for the modest sum of $2300 on his belief that, once it was successfully completed, Grinnell would aggressively market similar programs, resulting in substantial royalties and service contracts. Ward, meanwhile, agreed to pay Scott $2300 for a completed Flom product but believed that negotiations concerning future marketing must await Flom's acceptance of Scott's work.

At Scott's request, Ward reduced the parties' oral agreement to writing in February 1997 via the following e-mail message:

> This is to confirm our agreement for your company, Click-it, to create a multi-company quoting system for sale to FLOM Regional Mutual. Grinnell Infosystems is involved in this project because it has agreed to provide a solution for Flom to handle its multi-company quoting needs.
>
> Your quoted price for this project is $2300 which is payable by Grinnell Infosystems upon completion of the work and acceptance of the quoting system by Flom for use by its mutual and distribution to its agents.

Ward's message also outlined the technical requirements for the quoting system but made no mention of marketing it to other companies.

The prototype furnished by Scott in February was met with enthusiasm by Ward but required substantial revision to meet Flom's needs. Scott reportedly made the revisions in the hope of future rewards. A version submitted in May 1997 was likewise received with enthusiasm but also found wanting in the details. According to Scott, however, he was led to believe that he and Grinnell were "close" to achieving the desired product, a milestone that prompted Scott and Ward to discuss future marketing strategies in some detail. Scott then submitted written proposals for future compensation—joint ownership of the program with fixed compensation for Scott of $120,000 plus additional bonuses depending on sales—but received no response, positive or negative, from Ward.

Despite continued work on the program over the summer, Scott was never quite able to satisfy Flom's programming needs. Scott described the situation as working on a "moving target." Ward, meanwhile, complained that the programs submitted for trial by Flom could not be successfully operated. After each unsuccessful demonstration, Ward would submit a list of needed revisions to Scott.

In August, when Ward expressed uncertainty concerning the future of the program, Scott retained legal counsel. His lawyer wrote to Ward in September, expressing Scott's desire to be fairly compensated for his time and effort. Ward replied that "[u]pon completion of the listed corrections and subject to Flom's satisfactory review of the program, we would pay Click–It the amount agreed to of $2300. We wish to make it clear that this is the only amount which we have agreed to pay Click–It." Attached to the letter was a six-page list of additional changes. Scott suspended all work on the program.

In a letter written to Scott's lawyer in December 1997, Grinnell's general counsel confirmed that its agreement to pay $2300 had been contingent on receipt of a completed product and, failing that, it had no further obligation to Scott. The company likewise made no claim to the Click–It price-quoting program. Scott later learned that in June 1997, Grinnell had entered discussions with IDI, a Wisconsin company, concerning a computerized comparative rate-quoting program. By February 1998, Grinnell had purchased IDI's assets, including the rate-quoting program, for roughly $225,000. Grinnell thereafter marketed the program to 245 county mutuals in its nine-state area.

## II. Legal Proceedings.

Scott sued Grinnell for breach of contract for "expert computer design services." His petition rested on his claim that "[t]he law implies a promise to pay the reasonable value of services and/or products" and that Grinnell "knowingly accept[ed]" Scott's services but has "failed and refused to make reasonable arrangements to compensate him." Grinnell responded with a general denial and, later, moved for summary judgment. In its motion, Grinnell argued that because the parties had an express agreement regarding payment, Scott could not prevail on an implied contract as a matter of law. The district court overruled Grinnell's motion. Based on the limited record submitted, it concluded an agreement for "some amount of additional compensation was clearly implied," over and above the express agreement for $2300 upon completion of the Flom project. The case proceeded to trial.

At trial, Scott introduced evidence that from December 1996 through September 1997, he and two part-time employees devoted approximately 1800 hours to keying in data and building the computer program requested by Grinnell for Flom. He testified that custom programming of this type would ordinarily command compensation at the rate of $75 to $125 per hour in the marketplace. He insisted that the seemingly endless changes requested by Ward were, for the most part, not intended to correct errors but to modify the product beyond that originally contemplated by the parties' agreement.

Ward, for his part, did not dispute the reasonableness of the hourly wages Scott introduced. Nor did he contest the fact that he and Scott had engaged in preliminary negotiations concerning future marketing of the project upon successful completion and acceptance of the Flom program. He merely asserted the evidence was essentially irrelevant because the work performed by Scott was never suitable for its intended purpose and, so, the condition precedent to payment of the agreed sum of $2300—or to support planning a joint venture in marketing—was not fulfilled.

▮ At this juncture the court, as well as counsel for Scott, seemed to recognize that although the case had been pled on a theory of implied contract for the value of services received but uncompensated, no services of any value were ever received by Grinnell. Instead, the trial record arguably supported a claim for anticipatory breach of an express contract, not merely for the $2300 agreed upon by the parties but for the future marketing potential for Scott's program that would have existed but for Grinnell's unwarranted repudiation of their agreement. Thus, over Grinnell's objection, the court granted Scott's motion to amend his petition to assert breach of an express contract. It also sustained, over Scott's objection, Grinnell's motion for directed verdict on the alleged breach

of an implied contract, or quantum meruit.[2]

After further wrangling over the sufficiency of the evidence to support Scott's claim for reliance damages, the court submitted the case to the jury. It returned a verdict for $100,000 in Scott's favor. Grinnell's subsequent motions for new trial and for judgment notwithstanding the verdict were denied by the court. This appeal by Grinnell followed. Further facts will be detailed as they pertain to the issues on appeal.

### III. Issues on Appeal.

Grinnell urges three separate grounds for reversal: (1) the jury's verdict was excessive, the result of an erroneous instruction on damages; (2) the court erred in allowing plaintiff to amend his petition at the close of the evidence; and (3) defendants were entitled to directed verdict, or judgment notwithstanding the verdict, on plaintiff's claim of anticipatory breach of an express contract. In fact all three assignments of error are interrelated. They are rooted in Grinnell's allegation of prejudice flowing from the allowance of the amendment so late in the trial, a matter to which we now turn.

■■■ *Applicable law.* A decision granting leave to amend to conform to the proof rests in the sound discretion of the trial court, reversible on appeal only when a clear abuse of discretion is established. *Bennett v. City of Redfield*, 446 N.W.2d 467, 474–75 (Iowa 1989). Abuse may be demonstrated by proof that the court's decision rested on clearly untenable or unreasonable grounds. *Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 766 (Iowa 2002). The timing of a motion to amend, standing alone, is not a determinative factor. *Allison–Kesley Ag Ctr., Inc. v. Hildebrand*, 485 N.W.2d 841, 845 (Iowa 1992). The crucial question is whether the amendment substantially changed the issues before the court. *Id.* at 845–46.

Historically, "where pleadings allege an implied contract and the proof establishes an express contract, or vice versa, the result is a fatal variance." *Gosha v. Woller*, 288 N.W.2d 329, 331 (Iowa 1980) (citing *Wayman v. City of Cherokee*, 208 Iowa 905, 225 N.W. 950 (1929)). We recognize that modern rules of notice pleading have tempered the harshness of the rule, placing emphasis on proof of prejudice sustained by the party on the receiving end of the variance. *Id.; see* Iowa R. Civ. P. 1.457 (objecting party must prove amendment would prejudice maintenance of defense on the merits). Principles of fairness nevertheless dictate notice of the claims asserted in order to give the opposing party opportunity to make an adequate response. *Gosha*, 288 N.W.2d at 331.

■■■ To appreciate the quandary generated by the case before us, we must examine the elements of the theories advanced and defenses posed both before and after the amendment. Breach of an express contract requires proof of a contract in which the parties "manifest their agreement by words." *Iowa Waste Sys.,*

---

2. Scott argued in the trial court, and urges by way of cross-appeal, that the jury should have been permitted to consider alternative theories of recovery based on both implied contract and express contract. For the reason explained in the text above, the record is factually insufficient to support recovery based on quantum meruit, i.e., "a breach of an implied-in-fact contract, for the reasonable value of the services provided." *Iowa Waste Sys., Inc. v. Buchanan County,* 617 N.W.2d 23, 29 (Iowa Ct.App.2000). The argument's legal sufficiency is likewise suspect. *See Giese Constr. Co. v. Randa,* 524 N.W.2d 427, 431 (Iowa Ct.App.1994) ("An express contract and an implied contract cannot coexist with respect to the same subject matter, and the law will not imply a contract where there is an express contract."). We therefore give the claim no further consideration.

*Inc. v. Buchanan County,* 617 N.W.2d 23, 29 (Iowa Ct.App.2000); *accord Guldberg v. Greenfield,* 259 Iowa 873, 878, 146 N.W.2d 298, 301 (1966). An "agreement to agree to enter into a contract is of no effect unless all of the terms and conditions of the contract are agreed on and nothing is left to future negotiations." *Crowe–Thomas Consulting Group, Inc. v. Fresh Pak Candy Co.,* 494 N.W.2d 442, 444–45 (Iowa Ct.App.1992).

 An implied contract, by comparison, requires proof of an agreement that is "inferred in whole or in part from expressions other than words on the part of the promisor." *Iowa Waste,* 617 N.W.2d at 29. To recover for breach of a contract implied-in-fact, the plaintiff must prove the services were carried out under such circumstances as to give the recipient reason to understand that

(a) they were performed for him and not some other person, and

(b) they were not rendered gratuitously, but with the expectation of compensation from the recipient; and

(c) the services were beneficial to the recipient.

*Id.* at 30 (quoting *Bloomgarden v. Coyer,* 479 F.2d 201, 208–09 (D.C.Cir.1973)). "[T]he law will not imply a contract where there is an express contract." *Giese Constr. Co. v. Randa,* 524 N.W.2d 427, 431 (Iowa Ct.App.1994).

 For breach of an implied-in-fact contract, the injured party is entitled to quantum meruit—"the reasonable value of the services provided and the market value of the materials furnished." *Iowa Waste,* 617 N.W.2d at 29. By contrast, damages for breach of an express contract are limited to the protection of the injured party's "expectation interest" (benefit of the bargain) or "reliance interest." *Potter v. Oster,* 426 N.W.2d 148, 150 (Iowa 1988);

*accord* Restatement (Second) of Contracts § 344 (1979).

 Here, following the amendment, Scott sought only "reliance" damages, that is, reimbursement for loss caused by reliance on the contract, to place him in as good a position as if the contract had never been made. *See Potter,* 426 N.W.2d at 150. Such damages require proof of actual expenditures made, or forbearance of other opportunities, prior to the repudiation of the contract. 22 Am.Jur.2d *Damages* § 43, at 67 n. 61 (1988) (citations omitted); § 49, at 73. But in no event may recovery for expenditures exceed the contract price. Restatement (Second) of Contracts § 349 cmt. a, at 124; *see* Eric Mills Holmes, *Corbin on Contracts* § 8.8, at 22, 26 (rev. ed.1996).

*Analysis.* In *Gosha,* where the turnaround in legal theories was devised by the court following submission of the case without notice to the defendant, we held that fairness dictated reversal and remand for new trial. *See Gosha,* 288 N.W.2d at 331–32. The question is whether the same principles of fairness motivating the court in *Gosha* should be applied here. Although Grinnell had a chance to resist the amendment prior to submission of the case to the jury, the "before and after" legal theories at issue demanded such variance in proof and corresponding defense that we are convinced reversal and remand for retrial is compelled.

 Crucial to Scott's recovery of damages was proof that he and his staff devoted time to Grinnell's project that could have been devoted to other projects. Otherwise his recovery would rest solely on the reasonable value of the time expended on services for the defendants, an appropriate measure of damages in quantum meruit but not for breach of an express contract. Reliance damages are not designed to rescue the plaintiff from the

consequences of a bad bargain, but to compensate him for gains unrealized as a result of the breaching party's conduct. *See Dialist Co. v. Pulford,* 42 Md.App. 173, 399 A.2d 1374, 1382 (1979) (reliance damages sustained by proof of salary forgone in order to carry out contract).

Here, of course, the record before the jury included all of Scott's evidence of time records tailored to his pleaded theory of quantum meruit, irrespective of lost opportunities. And the alleged marketing agreement regarded by Grinnell as no more than an unenforceable "agreement to agree" was suddenly transformed into one segment of a multi-part express contract.

Grinnell was plainly prejudiced by submission of the case under a legal theory at variance with the proof and defense anticipated by the litigants both before and during the trial. *See Gosha,* 288 N.W.2d at 332 ("although [plaintiff's] petition was limited to the theory of express warranty the evidence was not"). As in *Gosha,* fairness dictates that we reverse and remand for new trial so that the elements of the claims, and the sufficiency of the defenses, may be adequately addressed based on the case being tried.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**