IOWA WASTE SYSTEMS, INC., an
Iowa Corporation, Plaintiff–
Appellant,

v.

BUCHANAN COUNTY, Iowa, a Munici-
pal Corporation and Governmental
Subdivision of the State of Iowa, and
Buchanan County Sanitary Landfill
Commission, a Statutorily Created
Governmental Entity, Defendants–Ap-
pellees.

No. 99–751.

Court of Appeals of Iowa.

May 31, 2000.

**26** 

Equity is according to the conscience of him that is Chancellor, and as that is larger or narrower, so is Equity. 'Tis all one as if they should make the standard for the measure we call a "foot" a Chancellor's foot; what an uncertain measure would this be! One Chancellor has a long foot, another a short foot, a third an indifferent foot. 'Tis the same thing in the Chancellor's conscience.

Richard Milward, *Equity, in Table Talk of John Selden* (Frederick Pollock ed.1927) (1689). However, as we find our feet to be roughly the same size as the trial court's, we affirm the trial court and deny all claims of error.

## I. Background Facts.

In 1980 Buchanan County leased to Nishna Sanitary Service, Inc. a large plot of land in order to operate what was to be the Buchanan County Landfill. The lease was to continue on a year-to-year basis, unless notice was given on or before September 1 on any given year, whereupon the lease would terminate on March 1 of the following year. In 1994 the Buchanan County Sanitary Landfill Commission entered into an operating agreement with Nishna that delineated the responsibilities and expectations of both parties concerning the operation of the landfill. The operating agreement was effective for a three-year term and was to be extended automatically for an additional three years, unless notice was given on or before January 1 of the final year, whereupon the operating agreement would terminate on July 1 of that year. The operating agreement placed the day-to-day operational costs on Nishna and required the Landfill Commission to pay for leachate[1] control and other closure costs.

In 1996 Nishna sold its landfill operations to Iowa Waste Systems, Inc. As part of that sale, Iowa Waste signed an "Ac-

Sean P. Conboy, Douglas E. Gross, and James L. Pray of Brown, Winick, Graves, Gross, Baskerville and Schoenbaum, P.L.C., Des Moines, for appellant.

James E. Brick of Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, P.C., Des Moines, for appellee-Buchanan County Sanitary Landfill Commission.

Allen W. Vanderhart, County Attorney, for appellee-Buchanan County.

Heard by STREIT, P.J., and ZIMMER and HECHT, JJ.

STREIT, P.J.

English Jurist, John Selden, best expresses Iowa Waste Systems' dissatisfaction with the trial court's ruling regarding its numerous equitable claims in writing,

Equity is a rougish thing. For Law we have to measure, know what to trust to;

[1.] Leachate is the liquid produced as a result of rain and surface water filtering through the various layers of garbage.

knowledgment of Transfer" whereby Iowa Waste would be substituted as the party of interest under both the lease and the operating agreement. After it had been operating the landfill for a few months, the Landfill Commission informed Iowa Waste it would be terminating their operating agreement effective July 1, 1997. Iowa Waste expected the notice of termination, but believed a new long-term operating agreement would be agreed upon.

Three months after receiving the notice of termination, Iowa Waste and the Landfill Commission began negotiating for (1) the sale of the landfill to Iowa Waste, (2) a new twenty-five-year operating agreement between the parties, and (3) Iowa Waste to reimburse the Landfill Commission the $200,000 it spent on implementation of the leachate control plan. A few weeks later, the Landfill Commission voted to enter into a letter of intent with Iowa Waste in preparation for the final agreement, but also cautioned that the final agreement was subject to ultimate approval by both the Landfill Commission and the Buchanan County Board of Supervisors. Shortly thereafter, the Landfill Commission rescinded its letter of intent and voted to close the landfill. The County then exercised its right to terminate the lease and notified Iowa Waste.

The termination of the operation agreement became effective July 1, 1997, but the lease for the land did not expire until March 1, 1998. Iowa Waste could not accept additional waste after June 30, 1997, but did have the right to remain on the property for an additional eight months. Immediately following the termination date of the operating agreement, the Landfill Commission, on numerous occasions, requested access to the landfill in order to take over the leachate control measures and begin closure of the landfill. The Landfill Commission also notified

Iowa Waste that in the event it failed to grant the Landfill Commission access, it would be solely responsible for the costs of continuing to perform leachate control activities. Iowa Waste refused to allow the Landfill Commission access to the site, continued to simply recirculate the leachate back through the landfill as a temporary measure [2], and continued to bill the Landfill Commission for the costs of those measures. The Landfill Commission refused to pay these bills.

Iowa Waste barred the Landfill Commission from the land for nearly seven months, during which time the Landfill Commission continued to reiterate its desires to gain access to the property and take over the leachate control measures. Finally on January 26, 1998, Iowa Waste granted the Landfill Commission access to the site in order to initiate permanent leachate control measures.

## II. Procedure.

Iowa Waste filed suit against the County and the Landfill Commission in May of 1997, alleging: (1) the Landfill Commission breached the operating agreement when it refused to pay for the implementation of the approved leachate control measures, (2) it was entitled to declaratory judgment regarding its continued possession of the land until the expiration of the lease, the Landfill Commission's obligation to pay for the leachate control measures, and attorney fees (3) it was entitled to indemnification, under the terms of the operating agreement, for costs of implementing the leachate control plan and the attorney fees generated in litigating this claim, (4) the Landfill Commission should be made to specifically perform on the operating agreement, (5) the Landfill Commission should be estopped from revoking the letter of intent under a theory of prom-

---

**2.** The act of simply recirculating the leachate by way of pumps was only a temporary remedy. More permanent leachate control measures were required by the Iowa Department of Natural Resources (DNR) and had to im-

plemented on a specific timetable. These permanent measures included collecting the leachate into large storage containers, and then transporting the leachate by way of truck to a water treatment plant.

issory estoppel, and (6) the Landfill Commission's termination of the operating agreement constituted an unconstitutional taking as it rendered Iowa Waste's disposal permit worthless. The Landfill Commission answered the petition and counterclaimed alleging among other things, (1) Iowa Waste breached the operating agreement by not following all applicable Iowa Department of Natural Resources regulations, (2) Iowa Waste operated the landfill negligently, and (3) Iowa Waste breached the lease by failing to restore the land used to farmland. The County also answered the petition and filed a series of counterclaims.

On summary judgment, the district court: (1) ordered on the declaratory judgment claim that the Landfill Commission was, under the agreement, only responsible for all leachate control costs prior to the termination of the operating agreement, but permitted the claim for attorney fees to proceed to trial; (2) permitted Iowa Waste's indemnification claim to proceed only as to future claims of contamination; and (3) dismissed Iowa Waste's claims of promissory estoppel and unconstitutional taking. Based on the court's handling of the declaratory judgment claim, Iowa Waste amended its petition to include a claim of "quantum meruit/unjust enrichment" for services provided after the termination of the operating agreement. The surviving claims of both parties proceeded to a bench trial. The court ruled, relevant to the present appeal, (1) Iowa Waste was not entitled to recovery on its claim of quantum meruit/unjust enrichment, (2) Iowa Waste could not recover its attorney fees under the contract, (3) the Landfill Commission could recover under breach of contract and negligence for Iowa Waste's operation of the landfill, and (4) Iowa Waste breached the lease by not restoring the land subject to the lease to farmland.

Iowa Waste appeals claiming the trial court erred in: (1) denying recovery on the basis of quantum meruit/unjust enrichment, (2) finding it both negligent and in breach for its operation of the landfill, (3) awarding the County damages for restoration of the land, (4) ushering out its claims of indemnification, promissory estoppel, and unconstitutional taking on summary judgment, and (5) denying recovery of attorney fees.

### III. Continued Leachate Recirculation.

Iowa Waste first claims it was denied equitable relief from the costs it incurred in continuing to perform certain leachate measures after the termination of the operating agreement. Iowa Waste blurs two distinct theories of recovery, quantum meruit and unjust enrichment, as its basis for recovery. However despite the years of inseparably connecting these two terms, the two terms are not only markedly different, but not even rooted in the same legal genre. *See Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C.Cir.1973); H. Hugh McConnell, *Distinguishing Quantum Meruit and Unjust Enrichment in the Construction Setting*, 71 Fla. B.J. 88, 88 n. 2 (1997) [hereinafter *Distinguishing Quantum Meruit*]. In order to appropriately address both theories, we must delve into their respective historical underpinnings and pinpoint where the two theories diverge.

The antiquated term *quantum meruit* literally means "as much as he deserved" and was historically employed in seeking compensation for agreed upon services under the common law writ of assumpsit (meaning "he undertook or promised"). *Drake v. Block*, 247 Iowa 517, 522, 74 N.W.2d 577, 580 (1956); *Distinguishing Quantum Meruit*, 71 Fla.B.J. at 88 n. 3. The common writ of assumpsit was not grounded in modern contract law but was simply a remedy designed to hold persons liable for promises not made under the King's seal—whether expressly stated, implied by their actions, or where no promise existed but justice required the at-law imposition of a judicially-created fictional promise. 1 Arthur Linton Corbin, *Corbin*

*on Contracts* § 1.18, at 51 (rev.ed.1993) [hereinafter *Corbin on Contracts*]. The term *quantum meruit* was pled under the common writ of assumpsit in those situations where services were performed based upon actions implying mutual assent and the party receiving the services refused to pay for them, whereas unjust enrichment, although still pled under the common writ of assumpsit, was utilized in those situations where there was no assent but a promise was equitably imputed to serve justice. *Id.; Distinguishing Quantum Meruit,* 71 Fla.B.J. at 88, n. 1. The likely historical source of confusion between the two terms lies in their mutual employment under the general writ of assumpsit. *See Paffhausen v. Balano,* 708 A.2d 269, 271 n. 3 (Me.1998). However, with the advent of modern contract law, the two terms diverged and no longer fell under the same general cause of action. Rather, quantum meruit became grounded in the realm of pure contract, whereas unjust enrichment was placed in the equitable sphere of quasi contract.

▄▄▄ In modern contract law, there have traditionally been two types of contracts—express and implied. *Irons v. Community State Bank,* 461 N.W.2d 849, 855 (Iowa App.1990). "When the parties manifest their agreement by words, the contract is said to be express." *Id.* When there "is merely a tacit promise, one that is inferred in whole or in part from expressions other than words on the part of the promisor" it is said to be implied in fact. *Corbin on Contracts* § 1.18, at 51. Thus,

the antiquated term *quantum meruit* is actually used to denote a particular subclass of implied-in-fact contracts—an implied-in-fact contract to pay for services rendered.[3] *See Bloomgarden v. Coyer,* 479 F.2d at 208. Recovery, therefore, on a claim of quantum meruit is guided by all present notions of contract law.[4] *United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.,* 81 F.3d 240, 246 (D.C.Cir. 1996); *Carvel Co. v. Spencer Press, Inc.,* 708 A.2d 1033, 1036 (Me.1998). True to its contractual roots, one may recover under a claim of quantum meruit, or more accurately a breach of an implied-in-fact contract, for the reasonable value of the services provided and the market value of the materials furnished. *See Paffhausen v. Balano,* 708 A.2d at 271; *Distinguishing Quantum Meruit,* 71 Fla.B.J. at 88.

▄▄▄ Unjust enrichment on the other hand is not grounded in contract law but rather is a remedy of restitution. *Irons v. Community State Bank,* 461 N.W.2d at 855. As it is not grounded in pure contract law such remedies are often referred to as quasi contracts or implied-in-law contracts. *Id.*

A quasi-contractual obligation is one that is created by law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent. If this is true, it would be better not to use the word "contract" at all. Contracts are formed by expressions of assent. Quasi contracts quite otherwise. The legal rela-

---

3. The other sub specie of an implied-in-fact contract was called quantum valebant and was pled in the situation where goods were delivered upon actions implying mutual assent but were not paid for. *See Corbin on Contracts* § 1.18(b).

4. As the term *quantum meruit* is not only antiquated but inevitably breeds confusion, the preferred phrase for asserting such a cause of action is an *implied-in-fact contract.* In fact, even the distinction between an express contract and one implied in fact is viewed as somewhat superfluous. All contracts rest on some overt communication of assent between the parties, whether written, oral, in sign language, or expressed by actions. *Corbin on Contracts* § 1.19, at 55–57. Thus, all contracts must be expressly communicated in some form or another. Furthermore, all contracts rest on the implications and inferences connoted by a particular choice of words, signs, or actions. *Id.* Thus, some implied meaning must be attributed to any communication of assent. Therefore, "the distinction between an express and an [implied-in-fact] contract ... is of little importance, if it can be said to exist at all." *Id.* § 1.19, at 57.

tions between contractors are dependent upon the interpretation of their expressions of assent. In quasi contract the relations of the parties are not dependent on such interpretations.

*Corbin on Contracts* § 1.20, at 64. Unjust enrichment is the modern designation for the doctrine of quasi contracts or contracts implied in law. *Smith v. Stowell*, 256 Iowa 165, 173, 125 N.W.2d 795, 799 (Iowa 1964). Damages under a claim of unjust enrichment are limited to the value of what was inequitably retained. *See Paffhausen v. Balano*, 708 A.2d at 271.

We now turn to the substance of Iowa Waste's respective claims.

## A. Implied-in-Fact Contract for Services (Quantum Meruit).

■■■ *1. Standard of Review.* Quantum meruit recovery based on an implied-in-fact contract is normally reviewed for correction of errors at law. *See Frontier Properties Corp. v. Swanberg*, 488 N.W.2d 146, 147 (Iowa 1992). However, because the parties agreed to try the case in equity our review is not at law but de novo. *Weinhold v. Wolff*, 555 N.W.2d 454, 458 (Iowa 1996).

■■■ *2. The Merits.* In order to establish an implied-in-fact contract to pay for services, the party seeking recovery must show:

(1) the services were carried out under such circumstances as to give the recipient reason to understand:

(a) they were performed for him and not some other person, and

(b) they were not rendered gratuitously, but with the expectation of compensation from the recipient; and

(2) the services were beneficial to the recipient.

*Bloomgarden v. Coyer*, 479 F.2d at 208–09 (footnote omitted). In the present case, the actions of Iowa Waste were not carried out in a manner that would reasonably indicate the Landfill Commission assented to its actions and simply failed to address the cost of these services. Three days after the termination of the operating agreement, the Landfill Commission not only requested the right to take over the site and perform the requisite leachate measures, but additionally informed Iowa Waste if it did not wish to grant access to the property, it would be solely obligated to protect the environmental integrity of the site. Such a direct declaration of dissent flies squarely in the face of an implied-in-fact contract for provided services. It clearly was not reasonable on the part of Iowa Waste to believe the Landfill Commission recognized any obligation to pay for these services. Given this overt failure of mutual assent, we cannot find the existence of an implied-in-fact contract for services performed after the expiration of the operating agreement. The trial court is affirmed as to this issue.

## B. Unjust Enrichment.

■■■ *1. Standard of Review.* As a claim for unjust enrichment is rooted solely in equitable principles, our review is de novo. Iowa R.App.P. 4.

■■■ *2. The Merits.* To recover on the basis of unjust enrichment, Iowa Waste must show: (1) it conferred a benefit upon the Landfill Commission to its own detriment, (2) the Landfill Commission had an appreciation of receiving the benefit, (3) the Landfill Commission accepted and retained the benefit under circumstances making it inequitable for there to be no return payment for its value, and (4) there is no at-law remedy that can appropriately address the claim. *See Irons v. Community State Bank*, 461 N.W.2d at 855; *Britvar v. Schainuck*, 791 P.2d 1183, 1184 (Colo.App.1989). The only elements of contention in this case concern whether Iowa Waste conferred a benefit on the Landfill Commission and whether the circumstances surrounding that alleged conferment ring of inequity or injustice if return payment for the value of those services was not ordered.

■ Whether Iowa Waste's recirculation efforts constituted a benefit to the Landfill Commission is as murky as the leachate itself. The record is void of evidence regarding the responsibility of the parties, given their respective legal statuses, if leachate was permitted to migrate off site. It is further unclear whether merely recirulating the leachate amounted to a benefit, when: (1) the volume of the leachate remained constant and the Landfill Commission would still bear ultimate responsibility for removing and treating all leachate; (2) the Landfill Commission could perform the same tasks as Iowa Waste, but in a more cost-efficient manner; and (3) the ultimate costs in removing and treating the leachate actually increased due to Iowa Waste's delay in permitting the Landfill Commission access to the site. Given this murkiness, we cannot find Iowa Waste met its burden of proof in establishing a conferment of an actual benefit upon the Landfill Commission.

■ Regardless of whether the actions of Iowa Waste can be construed as a benefit, we find the equities do not support a claim for unjust enrichment. The underlying policy issue surrounding a recognizable claim for unjust enrichment is, regardless of the legal position of the parties, a situation has arisen making it inequitable or unjust not to order restitution. The series of events surrounding Iowa Waste's claim, however, simply do not appeal to this underlying sense of justice. Immediately after the termination of the operating agreement, the Landfill Commission not only informed Iowa Waste it would not pay for any further leachate control measures, but repeatedly offered to perform the control measures itself and hold Iowa Waste completely harmless. Iowa Waste, however, refused to grant the Landfill Commission access to the land and even sought to enjoin it from coming onto the property. Such a situation does not conjure notions of justice. That being the case, we cannot find the Landfill Commission was unjustly enriched. The trial court properly denied Iowa Waste restitution.

### IV. The Cost of Intermediate Cover.

Iowa Waste next claims the trial court erred in granting the Landfill Commission damages for Iowa Waste's alleged failure to provide the proper depth of soil cover on the refuse as required by law. It claims there was insufficient evidence to support a breach of contract or that it was negligent.

■ **A. Standard of Review.** Although claims of breach of contract and negligence are usually tried at law, our review here is de novo as the parties agreed to try the case in equity. *Weinhold v. Wolff,* 555 N.W.2d at 458.

■ **B. The Merits.** The operating agreement between the parties required, among other things, that Iowa Waste comply with all applicable DNR regulations. Among those regulations is a requirement that: (1) all solid waste be covered with six inches of compacted soil at the end of each day, (2) an additional six inches of compacted soil be added within a week, and (3) an additional foot of compacted soil be added within sixty days—a grand total of two feet. Iowa Admin.Code r. 567–103.3(2)(b)–(d). The Landfill Commission, in support of its contention that Iowa Waste failed to provide sufficient adequate intermediate cover and therefore not only breached the contract but was negligent, offered the undisputed evidence of an expert who measured the amount of cover on the site and determined an additional 19,700 cubic yards of soil were needed to bring the site to statutory compliance. Iowa Waste attempts to refute this concrete physical evidence by arguing the DNR never cited the landfill for having inadequate cover. Simply because it was never caught by a governing authority does not make the existence of concrete evidence to the contrary moot. We find there was ample evidence of both a material breach of contract and an act of negli-

gence on the part of Iowa Waste. The damages awarded on this specific count of the counterclaim is affirmed.

### V. Restoration of the Borrow Area.

Iowa Waste next claims the trial court erred in awarding the County damages for Iowa Waste's failure to restore to farmland the area from which soil was borrowed to cover the refuse (the borrow area). Iowa Waste claims the language of the lease does not mandate such restoration, the County's entrance on the site constituted a surrender of the lease, and the provision requiring restoration became impossible due to legislation.

**A. Standard of Review.** We generally review the interpretation and construction of a contract as a matter of law. *Hartig Drug Co. v. Hartig,* 602 N.W.2d 794, 797 (Iowa 1999). However, our review here is de novo as the parties agreed to try the case in equity. *Weinhold v. Wolff,* 555 N.W.2d at 458.

**B. The Lease Language.** The lease between the parties included the following provision: "All land used for sanitary landfill shall be restored to farmland upon expiration of the landfill operation." Iowa Waste claims the provision should be so narrowly construed as to include only that land actually filled with refuse, and had the parties intended to include all land involved in the sanitary landfill operation the contract should have so stated.

When interpreting contractual terms, we must ascertain the meaning and intention of the parties as expressed by the language used. *Pathology Consultants v. Gratton,* 343 N.W.2d 428, 434 (Iowa 1984). The terms of the document, however, must also be read in light of the surrounding circumstances and given their practical meaning. *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 433 (Iowa 1984).

We cannot give the phrase "land used in sanitary landfill" such a narrow construction as to include only that land expressly used for the deposit of refuse. The synergy between the actual landfill and the area where soil is taken to cover the landfill cannot be denied. The soil taken from this land was utilized to provide the needed cover on the landfill itself. The reasonable and practical interpretation of the phrase includes the borrow area.

**C. Surrender of the Lease.** Iowa Waste next claims its grant of permission to the Landfill Commission to enter the land constituted a surrender of the lease and it was therefore released from any covenants contained in that lease. *See Parris–West Maytag Hotel Corp. v. Continental Amusement Co.,* 168 N.W.2d 735, 738 (Iowa 1969). The surrender of a lease is the yielding up of "the estate to the landlord, so that the leasehold interest becomes extinct by mutual agreement between the parties." *Beall v. White,* 94 U.S.(4 Otto) 382, 389, 24 L.Ed. 173 (1876). A landlord's acceptance of surrender may be express or implied. *Parris–West Maytag Hotel Corp. v. Continental Amusement Co.,* 168 N.W.2d at 738. Factors significant in determining whether surrender has occurred include, the changing of locks by the landlord, whether the tenant still had property on the premises, whether the tenant could still access the property, and if the tenant continued to pay rent or utilities. *See English v. Standard Optical Co.,* 814 P.2d 613, 618 (Utah Ct.App.1991). Iowa Waste failed to present evidence the actions of the parties constituted a surrender. There was no evidence regarding who controlled the property, whether rent was paid, or whether Iowa Waste continued to have property on the site. Furthermore, the agreement of the parties specifically grants the County *access* to the site through the *end of the lease term.* The language of the agreement only provides the County access to the site. There is simply no evidence of an express or implied mutual agreement to surrender the land.

**D. Impossibility.** Iowa Waste additionally claims the term of the contract

which called for restoration became objectively impossible and it was therefore under no obligation to perform that portion of the lease agreement. However, the trial court never ruled on the applicability of the impossibility doctrine to the borrow area. The issue was raised in the pretrial pleadings and motions, but there is no mention of impossibility in the trial court's findings of fact and conclusions of law. Under Iowa Rule of Civil Procedure 179(b), a party must alert the trial court of its failure to·resolve an issue, claim, or other theory properly submitted to preserve error. Iowa R.Civ.P. 179(b); R*itz v. Wapello County Bd. of Supervisors,* 595 N.W.2d 786, 789 (Iowa 1999). The purpose of a rule 179(b) motion is "to advise counsel and the appellate court of the basis of the trial court's decision in order that counsel may direct his attack upon specific adverse findings or rulings in the event of an appeal." *Berger v. Amana Society,* 254 Iowa 1036, 1040, 120 N.W.2d 465, 467 (1963). As Iowa Waste did not move under Iowa Rule of Civil Procedure 179(b) for an enlargement or modification of its conclusions, it is procedurally barred from review. The trial court is affirmed.

### VI. Conclusion.

We have carefully considered all claims urged by Iowa Waste, whether directly addressed herein or not, and find them to be without merit. The trial court is affirmed not only in regard to its trial findings but in its rulings on summary judgment as well.

**AFFIRMED.**