# IN THE COURT OF APPEALS OF IOWA

No. 17-0389
Filed January 10, 2018

**SPENCER CONVENIENT HEALTHCARE, L.L.C.,**
Plaintiff-Appellant,

**vs.**

**ANGELA McGREGOR,**
Defendant-Appellee.

_____

Appeal from the Iowa District Court for Dickinson County, David A. Lester, Judge.

Spencer Convenient Healthcare, L.L.C. appeals a district court ruling denying its petition for an injunction and damages and awarding Angela McGregor damages on her counterclaim for breach of contract. **AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

Jill M. Davis of Montgomery, Barry, Bovee, Steffen & Davis, Spencer, for appellant.

Matthew T. E. Early of Fitzgibbons Law Firm, L.L.C., Estherville, for appellee.

Considered by Danilson, C.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Spencer Convenient Healthcare, L.L.C. (SCH) appeals a district court ruling denying its petition for an injunction and awarding Angela McGregor damages on her counterclaim for breach of contract. SCH contends the district court erred in (1) concluding it breached the employment contract in terminating McGregor's employment rather than finding McGregor breached the contract; (2) interpreting the student loan repayment provision of the employment contract; and (3) awarding damages that were not foreseeable. McGregor requests an award of appellate attorney fees.

**I.      Background Facts and Proceedings**

Based upon the evidence we find credible, we make the following findings of fact. SCH is an urgent-care medical clinic located in Spencer, Iowa that is owned and operated by John and Carol Lewallen. Carol is an advanced registered nurse practitioner. John and Carol opened SCH in November 2012. The business was successful from the onset and drew patients from approximately a fifty-mile radius. As a result of this success, the Lewallens decided to open a second clinic. They leased and remodeled a building in Spirit Lake and hired another nurse practitioner to be the medical provider at that location. In July 2013, the Lewallens officially opened Lakes Convenient Healthcare (LCH) in Spirit Lake. Over the next year, the Lewallens hired other nurse practitioners to serve as medical providers in both locations, but the turnover for those positions was rather high.

In the summer of 2014, the Lewallens advertised for an opening for a provider. McGregor initiated communications with the Lewallens, but after a few

weeks, she accepted a position with a different employer in southeast Iowa. Shortly after that, the Lewallens reopened negotiations with McGregor. On November 17, 2014, the parties executed an employment contract memorializing the terms of McGregor's employment with SCH—the contract was prepared by the Lewallens without the assistance of legal counsel. The contract included a termination provision requiring both parties to provide ninety days written notice of any desire to terminate the employment relationship. The contract also included a non-compete clause which, upon termination, prohibited McGregor from working in another clinic within a sixty-mile radius of either SCH or LCH for two years. The contract also provided that SCH "agree[d] to take over the student loan repayment obligation that [McGregor] allegedly owe[d] to her [then] employer." McGregor officially began her employment with SCH in December. During her employment, she primarily worked at the LCH location.

Beginning in 2014, the Lewallens directed at least one of the nurses they employed, Tara Mixon, on more than one occasion to use outdated medical supplies before using newer supplies. Mixon advised Carol that this practice caused her concern, but Carol responded the outdated supplies needed to be used because supplies are expensive. In January 2015, as a result of her concern for the continuing practice, Mixon filed a complaint with the Iowa Board of Nursing (Board). Also in January, Mixon approached McGregor, a fairly new employee at the time, and advised her of the informal outdated-supplies policy. Mixon showed McGregor some of the outdated supplies, upon which McGregor observed notations to "use these products first." McGregor advised Mixon they could not use the outdated supplies. Mixon agreed but noted she was getting in

trouble for not using them. McGregor made several attempts to discuss this practice with the Lewallens, but she was largely ignored. McGregor confronted John about the practice at one point, but he simply replied, "It's my clinic. When you have your clinic, you can do what you want. And this stuff is expensive, you know."

Because McGregor believed that some of her reference books had previously been stolen from her office at LCH, on February 9, she removed the remainder of her books from her office. However, she left personal effects and medical equipment in her office. On this date, McGregor also advised the office manager that she had some issues she needed to discuss with the Lewallens. The office manager relayed this message to John, but he did not want to talk to McGregor. Concerned, McGregor contacted the Board and CLIA[1] on February 12. Both bodies advised McGregor she should file an official report outlining her concerns. On February 13, McGregor filed a complaint with the Board alleging, among other things, lab supplies are expired and medications are outdated.[2] A complaint was also filed with CLIA.[3]

February 14 was McGregor's scheduled day off, but she worked on February 15. On February 16, SCH and LCH staff met at a local grocery store to discuss health-insurance options. McGregor attended this meeting. After the meeting, McGregor returned to the clinic in Spencer and worked for an hour but

---

[1] According to testimony, CLIA is a federal regulatory body that oversees medical laboratory procedures.
[2] In November, the Board notified the Lewallens that the complaint filed by McGregor was closed with no further action.
[3] CLIA's investigation found expired products and deficiencies in the clinics' documentation practices. SCH developed a plan of correction which was ultimately approved by CLIA.

then went home sick. McGregor called in sick on February 17 as well. That evening, McGregor reported she would be at work on February 18, but John directed her to take another day off if she was not at one-hundred percent. Prior to this, John had no problem with McGregor working while she was ill. The next two days, February 19 and 20, were McGregor's scheduled days off.

On February 18, John called the office manager and advised her he recently heard one of the staff members turned SCH in to the State for using expired supplies. In a separate phone call later that day, John advised the office manager that he planned to ask McGregor if she was the one who filed a complaint, that if she responded in the affirmative, "he doesn't want her back," and, if she responded in the negative, he "knows she is lying." The office manager relayed this information to McGregor. McGregor testified that, upon receiving this information, she realized she may have to start exploring other employment opportunities.

On February 20, the Lewallens called an impromptu staff meeting regarding McGregor's continued employment with SCH. It does not appear that McGregor was invited to or otherwise aware of this meeting. After the meeting, John called McGregor and left a voicemail directing her to turn in her keys because he and Carol had not had any communication with her in sixteen days.[4] McGregor responded with a text message that evening, advising she would turn her keys in when she received her final paycheck. Shortly after the separation,

---

[4] It is unclear why John provided this reasoning for his direction that McGregor turn in her keys. Based on the facts that McGregor attended a staff meeting on February 16 and, despite being sick, attempted to come to work on February 18, we conclude John's stated reasoning is pretextual.

McGregor accepted a position with Crown Clinic, another urgent-care provider. In July, Crown Clinic opened its facility near the LCH clinic.[5]

Prior to the conclusion of McGregor's employment with SCH, the Lewallens did not make any payments towards McGregor's student-loan obligation. After the separation, McGregor's prior employer notified her that the entire outstanding balance of her loan, $21,735.47, was due and noted it was unsuccessful in its attempts to contact SCH for payment. The notice advised, "Because you are ultimately responsible for the loan, we are looking to you for repayment." McGregor was able to settle this loan obligation with her prior employer by paying it $20,000.00 rather than the full amount. Because her financial resources were limited at this time, McGregor withdrew funds from her 403(b) retirement plan to meet the obligation. A certified public accountant and valuation analyst testified McGregor's withdrawal of these funds subjected her to state and federal taxes at a rate of thirty-three percent and an additional early-withdrawal penalty of ten percent. Applying these figures to the amount paid would result in a total penalty of $8600.00.

In March, SCH petitioned for a temporary and permanent injunction, alleging McGregor's employment with Crown Clinic was in violation of the non-compete clause contained in her employment contract and requesting an order enjoining McGregor from working for Crown Clinics and an award of damages. In her answer, McGregor forwarded a number of counterclaims—the only one relevant to this appeal is breach of contract. The district court subsequently denied SCH's petition for a temporary injunction and set the matter for trial.

---

[5] Unable to compete with Crown Clinic, the Lewallens decided to close LCH in August.

Following a two-day trial, the district court entered a written ruling. With regard to SCH's claim, the court concluded (1) John terminated McGregor's employment on February 20, 2015; (2) the termination, which was unjust and unfair and was effectuated without proper notice, was a breach of the termination provision contained in the contract; and (3) as such, SCH was not entitled to enforcement of the non-compete clause or an award of damages.

As to the relevant portion of McGregor's breach-of-contract counterclaim, the district court interpreted the student-loan provision of the contract to require SCH "to assume payment of the full principal amount" of the loan and concluded SCH "remained obligated to pay that amount in full at the time [it] terminated McGregor's employment on February 20, 2015." The district court awarded McGregor damages in the amount of $28,600.00[6] in relation to SCH's breach of the student-loan provision of the contract. The district court denied SCH's subsequent motion to enlarge or amend. This appeal followed.

## II. Standard of Review

The parties disagree as to the appropriate standard of review. SCH argues, because the district court tried this case in equity, our review should be de novo. *See, e.g.*, *Davis-Eisenhart Mktg. Co., Inc. v. Baysden*, 539 N.W.2d 140, 142 (Iowa 1995). McGregor contends, because the case contemplates legal, rather than equitable claims, our review should be for correction of errors at law. *See, e.g.*, *Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013) ("The standard of review for a breach of contract action is for correction of

---

[6] This amount equals the sum of the amount paid by McGregor to settle the obligation, $20,000.00, and the tax liability and penalties associated with McGregor's withdrawal of the funds from her retirement account, $8600.00.

errors at law."); *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999) ("We generally review the construction and interpretation of a contract as a matter of law.").

During the trial on the merits, the district court specifically noted, due to the presence of an equitable claim, it was trying the case in equity. *See Matlock v. Weets*, 531 N.W.2d 118, 121 (Iowa 1995) ("A request for an injunction invokes the court's equitable jurisdiction."). In fact, the court advised the parties "[i]t will be a de novo review if appealed." Neither party objected. Because of the parties implicit agreement to have this case tried in equity, we will review this case de novo. *See Iowa Waste Sys. v. Buchanan Cty.*, 617 N.W.2d 23, 32 (Iowa Ct. App. 2000).

Under a de novo review, our duty is to review the facts as well as the law and adjudicate rights anew. *Abodeely v. Cavras*, 221 N.W.2d 494, 504 (Iowa 1974). Where, as here, the testimony is conflicting, we give great weight to the factual findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them. Iowa R. App. P. 6.904(3)(g); *Albert v. Conger*, 886 N.W.2d 877, 880 (Iowa Ct. App. 2016). "This is because the trial court is in a far better position to weigh the credibility of witnesses than the appellate court." *Albert*, 886 N.W.2d at 880.

## III. Breach of Employment Contract

SCH challenges the district court's finding that it breached the employment contract. SCH contends McGregor breached the contract first by voluntarily quitting her position without providing ninety days written notice and, as such, she subsequently breached the contract by violating the non-compete

clause. This is largely a challenge to the district court's factual findings and the legal conclusions flowing from those findings. As noted above, we give great weight to the district court's factual findings. *Id.* Further, the finder of fact "is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). "In fact, the very function of the [factfinder] is to sort out the evidence and 'place credibility where it belongs.'" *Id.* (quoting *State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984)).

Upon our de novo review of the record, we conclude SCH terminated McGregor's employment on February 20, 2015. Although there is some evidence McGregor may have intended to seek other employment, this flowed from McGregor's receipt of information that John did not "want her back" as a result of his assumption that she filed official complaints with the Board and CLIA. And at the time she was terminated by John, McGregor had not taken any overt act to officially end her employment with SCH. *Cf. Peck v. Emp't Appeal Bd.*, 492 N.W.2d 438, 440 (Iowa Ct. App. 1992) ("[Q]uitting requires an intention to terminate the employment relationship accompanied by an overt act carrying out that intent."). She stated her intention to report to work on February 18, but John directed her not to do so. She was scheduled to have days off on February 19 and 20 but was ultimately terminated by John on the 20th.

Under these circumstances, we agree with the district court that McGregor did not voluntarily quit. We limit our analysis on this issue to SCH's sole argument on appeal, that McGregor breached the contract first by voluntarily

quitting.[7]  *See* Iowa R. App. P. 6.903(2)(g)(3).  We therefore affirm the district court's determination that SCH breached a material provision of the employment contract by terminating McGregor's employment and, accordingly, that the non-compete clause is unenforceable against her.

## IV.      Interpretation of Student-Loan Provision

SCH contends the district court erred in its interpretation of the student-loan-repayment provision of the employment contract.  As noted above, the district court interpreted the student-loan provision of the contract to require SCH "to assume payment of the full principal amount" of the loan and concluded SCH "remained obligated to pay that amount in full at the time [it] terminated McGregor's employment on February 20, 2015."

Contract "[i]nterpretation is the process for determining the meaning of the words used by the parties in a contract."  *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435 (Iowa 2008).  "The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract."  *Id.* at 437; *see also Peak v. Adams*, 799 N.W.2d 535, 543 (Iowa 2011).  Unless the contract contains an ambiguity, we determine the parties' intent from the language of the contract alone and enforce it as written.  *Petty v. Faith Bible Christian Outreach Ctr., Inc.*, 584 N.W.2d 303, 306 (Iowa 1998).

The provision contained in McGregor's employment contract provides the following:

---

[7] SCH does not challenge the district court's determination that its termination of McGregor's employment was a material breach of the employment contract that rendered unenforceable the non-compete clause.

> [SCH] agrees to take over the student loan repayment obligation that [McGregor] allegedly owes to her current employer. Currently the principal amount due is $21,735.47. SCH will make every effort to determine if this loan is legitimately owed to the [current employer] or if any of the amount was already paid by the federal loan forgiveness program. If the amount is found to be accurate and due, SCH may take a business loan for the entire amount with an extended repayment term up to 4 years to lower the current payment to better fit into the business budget. In return for repayment of this loan, a 4 year obligation of [McGregor] to work for [SCH] is expected as a term of agreement to cover the student loan. If [McGregor] would terminate employment prior to completion of the loan repayment term, the balance of the noted minus the reduced pro-rated amount for credit during the time employed, is expected to be reimbursed by [McGregor] to [SCH]. At the end of the loan repayment term, and after the employment obligation has been met, the entire amount of this loan is considered paid in full by both parties.

We find this language clear and unambiguous: SCH "agree[d] to take over the student loan repayment obligation." Under this provision, upon the commencement of McGregor's employment, SCH had the option to "take a business loan for the entire amount with an extended repayment term up to 4 years." If SCH selected that option, then, in return for payment of the business loan, "a 4 year obligation of [McGregor] to work for [SCH] [was] expected as a term of agreement to cover the student loan." But, if McGregor left employment prior to the completion of the four-year business-loan term, she would be required to reimburse SCH for any payments made after her separation.

SCH took no steps to exercise the four-year business-loan option. Thus, we need not determine whether McGregor's involuntary departure from employment triggered the repayment provision of the student loan provision. SCH's failure to exercise the business-loan option at the commencement of McGregor's employment leaves it with its obligation to "take over the student loan

repayment obligation" which was due in full at the time McGregor terminated her employment with her prior employer. We accordingly affirm the district court's conclusion that SCH is responsible for payment of the student loan in its entirety. In doing so, we repeat the district court's admonition that "employers should not attempt to draft something as important as an employment contract without the assistance of an attorney trained in such matters."

**V.      Foreseeability of Damages**

Finally, SCH argues the district court erred in awarding McGregor damages that were not foreseeable. SCH specifically argues the income taxes and the penalty to which McGregor was subjected as a result of liquidating her retirement account to pay off her student loan were not foreseeable results of SCH's breach. McGregor contests error preservation on this argument, contending "[t]his argument was neither raised at trial nor raised in SCH's post trial motion." However at the hearing concerning SCH's motion to enlarge or amend, SCH specifically argued, "[T]he whole balance of the student loans and then the penalty and expenses that she incurred when she had to use her . . . retirement funds in order to pay off that loan, . . . those damages are not foreseeable." The district court rejected SCH's foreseeability-of-damages argument in its entirety. We conclude error was preserved. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

"[D]amages based on breach of contract must have been foreseeable or have been contemplated by the parties when the parties entered into the agreement." *Kuehl v. Freeman Bros. Agency, Inc.*, 521 N.W.2d 714, 718 (Iowa 1994). "Whether the damages were reasonably anticipated by the parties when

the contract was formed may be discerned from 'the language of the contract in light of the facts, including the nature and purpose of the contract and circumstances attending its execution.'" *Id.* (quoting 22 Am. Jur. 2d *Damages* § 460 (1988)). "Damages which a reasonable person would expect to follow from breach of a contract are direct and thus should be awarded." *Id.*

With these principles in mind, we conclude, although McGregor's obligation to pay the student loans flowed directly from SCH's breach, her decision to incur the resulting of tax and early-withdrawal penalties could not have been reasonably anticipated by the parties when the contract was formed. As such, we vacate the portion of the damage award relating to the tax and early-withdrawal penalties and remand the case to the district court to enter judgment consistent with our decision.

## VI. Appellate Attorney Fees

McGregor requests an award of appellate attorney fees under Iowa Code section 91A.8, which allows an award of attorney fees for claims brought under the Iowa wage payment collection law. Because this appeal did not contemplate McGregor's wage claim, we decline McGregor's request for an award of appellate attorney fees.

## VII. Conclusion

We affirm the district court's (1) determination that SCH breached a material provision of the employment contract by terminating McGregor's employment and, accordingly, that the non-compete clause is unenforceable against her and (2) interpretation and application of the student-loan-repayment provision of the employment contract. We conclude, although McGregor's

decision to incur tax and early-withdrawal penalties flowed directly from SCH's breach, such penalties could not have been reasonably anticipated by the parties when the contract was formed. As such, we vacate the portion of the damage award relating to the tax and early-withdrawal penalties and remand the case to the district court to enter judgment consistent with our decision. We deny McGregor's request for an award of appellate attorney fees.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**