# IN THE COURT OF APPEALS OF IOWA

No. 19-0540
Filed July 22, 2020

**ARTHUR H. KOLLIAS d/b/a CUSTOM BUILDERS & REMODELERS,**
       Plaintiff-Appellant,

**vs.**

**MARK J. CARDIS, LAURA ELENA C. DE GALLEGO, and OHNWARD BANK & TRUST,**
       Defendants-Appellees.
_____

Appeal from the Iowa District Court for Linn County, Christopher L. Bruns, Judge.

A builder appeals the denial of his application to foreclose a mechanic's lien and argues he is entitled to a judgment for the reasonable value of his work and materials from the owners of a Victorian house. **AFFIRMED.**

Kevin H. Collins and Sarah J. Gayer of Nyemaster Goode, PC, Cedar Rapids, for appellant.

Stephen B. Jackson, Sr. and Elizabeth J. Craig (until withdrawal) of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for appellees.

Considered by Tabor, P.J., and May and Greer, JJ.

**TABOR, Presiding Judge.**

Neglected for decades, an 1876 Victorian mansion brought two former Cedar Rapids neighbors together. Mark Cardis and his business partner Laura DeGallego bought the house and enlisted Cardis's old friend, Arthur Kollias, to help restore "its original grandeur." Cardis believed: "It became a good chore." But the trust between Cardis and Kollias eroded about two years into the project. Kollias filed a mechanic's lien on the property, alleging Cardis and DeGallego owed him more than $100,000 in labor and materials. Kollias petitioned to foreclose on the mechanic's lien and sued for damages. After a trial, the district court ruled for the homeowners. On appeal, Kollias alleges Cardis and DeGallego owe him about $148,000 for the reasonable value of his services and materials, plus interest and attorney fees. Because we find substantial evidence to support the district court's ruling, we affirm.

## I. Facts and Prior Proceedings

Cardis grew up in the historic Cedar Rapids neighborhood of 12th Street and First Avenue. Builder Kollias lived on the same block and became a mentor to Cardis, who was twenty years younger than Kollias. Also in the neighborhood stood a dilapidated Victorian house known as Ferguson's Hill.[1]

Fast forward to 2012. Now living in California, Cardis and his business partner, Laura DeGallego, buy Ferguson's Hill. Cardis found the house "in rough

---

[1] According to Cedar Rapids historian Mark Stoffer Hunter, "The house, a Victorian with Italianate features, was built for businessman Henry V. Ferguson—vice-president of the Cedar Rapids & Marion Railway Co.—and later used as a home by Mayor Charles Huston." *California Man Returns to Cedar Rapids to Restore Hilltop Victorian Home*, savecrheritage.org (December 10, 2013).

shape." Previous owners had "trashed the place out, cut it up and tried to remodel it, but it was very poor workmanship."

Enter Arthur Kollias. He was then in his late sixties and had more than three decades of experience as a building trades contractor. Cardis approached Kollias a couple of times about helping with the Victorian renovation before he agreed. Cardis would be going back and forth from California and wanted Kollias to oversee the other workers on the project.[2] Kollias testified he didn't think his involvement "would last that long." But Kollias worked on the renovation from December 2012 until December 2014.

During those two years, Kollias did not have a written contract with Cardis and DeGallego. Kollias testified the owners never told him that he was taking too much time or incurring too much expense. According to Kollias, "Mark said we would settle up later. And as a friend, I accepted that."[3] At trial, Kollias testified, "I made notes of what I did and so forth." Yet he never submitted time sheets to Cardis or DeGallego. They also never settled on an hourly rate for Kollias's work.[4] Kollias conceded, "We never discussed much about money. He said he would take care of me in the end."

---

[2] Cardis later estimated they had more than twenty contractors, including plumbers, painters, and electricians, working on the house project. Mark's brother, Craig Cardis—who was self-employed as a general contractor--also helped with the repair work.

[3] In his trial brief, Kollias contends this case "epitomizes the adage 'no good deed goes unpunished.'" In their responsive brief, the owners couch the situation in more legal terms, contending they had no "meeting of the minds" on reimbursement for Kollias.

[4] Kollias insists he should receive $65 per hour for his skilled work. DeGallego testified they never agreed to that rate, and wouldn't have, because "[i]t's too expensive for our budget." Kollias contends he cannot make a profit at the rate of $40 per hour applied by the district court.

On their end, Cardis and DeGallego believed they had taken care of Kollias. DeGallego testified, "I think we paid him very well." She recalled that when they asked how much they owed him, "Art would say, 'don't worry about it, it's okay, you're paying me.'" Cardis testified Kollias preferred being paid in cash because it "wouldn't interfere with his assistance from Social Security or Medicare." The home owners called three witnesses who recalled Cardis paying Kollias in cash. When asked for a tally of their reimbursements, Cardis estimated they paid Kollias around $200,000 during his involvement in the project. But Cardis could not produce an accounting of those payments. In their pretrial brief, the owners asserted they had compensated Kollias "to the tune of over $105,000."

Cardis acknowledged the renovation project succeeded and Kollias was "essential" to that success. Indeed, both Cardis and DeGallego admired Kollias's craftsmanship, especially his skill in fabricating most of the custom millwork for the house. Kollias testified he bought special equipment to replicate the Victorian-era trim.

So the problem was not the quality of Kollias's work. Rather, the problem was the parties' undefined expectations. Cardis testified they never discussed the financial terms of their arrangement. For his part, Kollias claimed he "accounted for every penny that came in and went out, every nail that was used." Yet he acknowledged he did not assemble that information into a written bill for the owners until he filed the mechanic's lien in September 2016.

In the mechanic's lien, Kollias alleged the owners owed him $133,735 in materials and labor. By trial, Kollias had upped that amount by about $15,000. Overall, he alleged he expended $222,099.77 in labor and materials on the house

project.  Kollias alleged the owners paid him $105,400, of which $31,515 went to other contractors, leaving $73,885 owed to him.[5]  (Kollias then added $470 for "administration, travel, and filing fees.")  At bottom, Kollias contended that Cardis and DeGallego still owed him $148,684.77 for his performance and materials.

In February 2017, Kollias filed both a petition at law seeking damages for breach of contract[6] and a petition in equity to enforce the mechanic's lien.[7]  The district court consolidated the actions in April 2018.  The parties tried the matters to the court in December 2018.

In January 2019, the court entered judgment for the owners.  The court determined Kollias "should have been paid $113,877.13" under the theory of quantum meruit.  The court then noted Kollias's concession that he received $73,885 from the owners.  The court continued:

> Kollias's figure includes the $18,500 in cash that he admits he was paid.  The question the court is faced with is whether Cardis likely paid Kollias another $39,992.13 in cash.  More correctly stated, did Kollias prove by a preponderance of the evidence that he wasn't paid the $39,992.13?

Faced with no contemporaneous accounting from either party to document the amount of cash payments, the court split the difference.  "In short, the court is convinced Kollias was paid significantly more cash than the $18,500 to which he admits.  The court is also convinced Kollias was paid significantly less cash than

---

[5] Kollias agreed in his testimony that Cardis sometimes paid him in cash but was evasive about how many times.

[6] The petition did not allege recovery under a theory of quantum meruit or mention an implied-in-fact contract.

[7] Kollias alleged in the equity petition that Ohnward Bank's interest in the mortgage was subordinate to his interest.  The district court dismissed the claim against the bank, and it is not at issue in this appeal.

the $104,460 claimed by Cardis." The court deduced, "Cardis paid Kollias at least $39,992.13 in cash over and above the $18,500 admitted by Kollias." From that deduction, the court ruled Kollias failed to prove a breach of the implied-in-fact contract or any damages.

Seizing on the district court's language on his burden, Kollias moved to reconsider the judgment. He argued under the doctrine of quantum meruit he did not have to prove the owners breached the implied contract through nonpayment or damages. In a March 2019 order, the court held, "The parties' dispute as to burden of proof does not impact the outcome of this case." The court reasoned, whether it placed the burden on Kollias or required the owners to prove an affirmative defense, "the preponderance of credible evidence established that [Kollias] had been paid at least $113,877.13."

Kollias now challenges the January and March 2019 rulings.

## II.    Scope and Standards of Review

Often the standard of review is a routine recitation in our opinions. But here it is contested and critical. In his opening brief, Kollias contends we have a dual standard: (1) de novo review for the mechanic's lien because it was tried in equity and (2) correction of errors at law for the contractual damage claims.

The district court aptly described the hybrid situation:

> The mechanic's lien case is in equity, but the remainder of the case
> appears to be one that's at law. . . . So that will put me in a weird
> position with regard to objections. I probably will, unless the
> objection is one of the rare objections that matters in equity, take
> evidence subject to objections. I'll have to, when I write the decision
> if I rely on a piece of evidence that I took subject to objection, give
> you a ruling on the objection so we can all discern whether I relied

on it for the law part of the case and if I relied on it for the equity part of the case, what I did with the objection.

In response, Cardis and DeGallego argue that because the issue is "legally framed by the doctrine of quantum meruit" and that doctrine falls into "the realm of pure contract," our review is for correction of errors at law. *See Frontier Props. Corp. v. Swanberg*, 488 N.W.2d 146, 147 (Iowa 1992). In his reply brief, Kollias insists "[b]ecause of the manner in which the district court received evidence, review should be de novo."

We agree with Cardis and DeGallego. When a litigant seeks both legal and equitable relief, we classify the action according to its primary purpose or controlling issue. *See Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 179 (Iowa 2010). The essential character of Kollias's case is determining the amount of recovery, if any. *See Iowa Waste Sys. Inc. v. Buchanan Cty.,* 617 N.W.2d 23, 30 (Iowa Ct. App. 2000) (noting courts normally review quantum meruit recovery based on implied-in-fact contract for corrections of errors at law). At trial, the court ruled on some objections. And the court issued a ruling and judgment, not a decree. In view of these factors, we find the case was tried at law. Thus, we review for the correction of legal error.

Under that standard, as long as substantial evidence supports the district court's findings of fact, they are binding on us. *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 490 (Iowa 2000). Substantial evidence means that proof which a reasonable mind would accept as adequate to reach the same findings.

*Id.* We won't find evidence insubstantial just because it would have supported contrary inferences. *Id.*

### III. Analysis

The district court declared, "If Kollias has a claim in this case, it is clearly one for quantum meruit." Quantum meruit "means literally 'as much as he or she has earned.'" Bryan A. Garner, *Garner's Dictionary of Legal Usage* 741 (3d ed. 2011) (also defining term as "the reasonable value of services" and defining companion term, quantum valebant, as "the reasonable value of goods and materials").

Our supreme court describes these theories of recovery as "quasi-contractual" because they arise from the law's recognition of an implied promise to pay for the services of another that the recipient knows about and accepts. *State Pub. Def. v. Iowa Dist. Ct. for Woodbury Cty.*, 731 N.W.2d 680, 684 (Iowa 2007). Put another way, "it is unfair to allow a person to benefit from another's services when the other expected compensation." *Id.*; *see also Simon v. Avenarius*, No. 08-1874, 2009 WL 2525485, at *5 n.5 (Iowa Ct. App. Aug. 9, 2009) (noting plaintiff misused "quantum meruit terminology" as a synonym for unjust enrichment).[8] "True to its contractual roots, one may recover under a claim of quantum meruit, or more accurately a breach of an implied-in-fact contract, for the reasonable value

---

[8] Unlike quantum meruit, unjust enrichment ignores the parties' expectations and focuses on society's interest in preventing the injustice of one party retaining a benefit without paying the provider. *See* H. Hugh McConnell, *Distinguishing Quantum Meruit and Unjust Enrichment in the Construction Setting*, 71 Fla. B.J. 88, 88 n. 2 (1997)

of the services provided and the market value of the materials furnished."[9]  *Iowa Waste Sys. Inc.*, 617 N.W.2d at 29.

Without dispute, the parties here did not enter an express written contract. So the district court examined whether Kollias proved the elements of an implied-in-fact contract.  To be reimbursed, Kollias had to show (1) he performed services under circumstances giving the home owners reason to understand (a) that he was providing the services for them, (b) he did not do so gratuitously, but expected compensation from the home owners; and (2) the services benefited the home owners.  *See id.* at 30; *see also Scott v. Grinnell Mut. Reinsurance Co.*, 653 N.W.2d 556, 562 (Iowa 2002).  The parties did not dispute these elements.  The owners agreed Kollias expected compensation for his labor and materials.  In fact, the owners paid him, at least in part, for his efforts.  And the owners acknowledged they accepted and enjoyed his craftsmanship.

Given their agreement, the district court decided Kollias was entitled to compensation under an implied-in-fact contract with the owners.  But how much compensation was still due?  In the court's words, "To prevail in this case, Kollias had to prove Cardis has not paid for the services and materials Kollias contributed

---

[9] Justice Michael Streit, then a judge on our court, noted, "[T]he term *quantum meruit* is not only antiquated but inevitably breeds confusion."  *Iowa Waste Sys. Inc.*, 617 N.W.2d at 29 n.4.  The opinion urged "the preferred phrase for asserting such a cause of action is an *implied-in-fact contract.*"  *Id.*  Other experts say the preferred term is *quasi-contract.*  "Quasi-contracts have often been called implied contracts or contracts implied in law; but, unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises.  They are obligations created by law for reasons of justice."  Restatement (Second) of Contracts § 4 (1981).

to Ferguson's Hill. As to the additional $39,992.13 [in cash payments], the court finds Kollias failed to meet his burden."

Attacking that analysis, Kollias contends the district court mistakenly placed the burden on him to prove nonpayment.[10] Kolias cites *McFarlin v. Quegg* to argue, once a plaintiff establishes a prima facie case of quantum meruit, the burden shifts to the defendant to prove an "affirmative or special defense." 192 N.W. 401, 402 (Iowa 1923). Kollias also relies on *Sulzberger Excavating, Inc. v. Glass*, for this contention: "If the defendant proves no defense, the plaintiff is entitled 'to recover the reasonable value of its services rendered thereto.'" 351 N.W.2d 188, 194 (Iowa Ct. App. 1984). By quoting selective snippets from earlier cases, Kollias blurs the line between the concept of quantum meruit and the burden of proof under an implied-in-fact contract.[11]

We take this chance to add some clarity. Quantum meruit is a "theory of recovery." *State Pub. Def.*, 731 N.W.2d at 684. More precisely, under Iowa law, it is the recovery available for an injured party who can show the breach of an implied-in-fact contract. *See Scott*, 653 N.W.2d at 562. The measure of that

---

[10] Cardis and DeGallego argue the structuring of the burden of proof is not critical because they pleaded payment by way of affirmative defense. We believe Kollias had the burden to prove his claim for additional reimbursement. But if the burden shifted, we agree the owners offered sufficient proof that their existing payments satisfied their obligation to Kollias.

[11] No doubt Justice Streit saw this confusion coming. *See Iowa Waste Sys. Inc.*, 617 N.W.2d at 29 n.4. Contrary to Kollias's argument, *McFarlin* did not place the burden on the defendant to prove payment as an affirmative defense to a quantum meruit claim. Rather, the affirmative defense in *McFarlin* was the existence of a contract term setting a different hourly compensation rate. 192 N.W.2d at 401–02. By the same token, the issue in *Sulzberger* was whether the defendant proved that an express contract superseded the implied contract. 351 N.W.2d at 194. Kollias also points to several other cases that discuss affirmative defenses, but they do not involve claims under quantum meruit or implied-in-fact contracts.

recovery is "the reasonable value of the services provided and the market value of the materials furnished." *Id.* That measure differs from proof of damages related to an expectation or reliance interest for the breach of an express contract. *Id.*

As the district court found, "There was never any meeting of the minds between Cardis and Kollias as to what Kollias would be paid for any work he performed on Ferguson's Hill." When that specification is lacking, "a person who performs services pursuant to request is entitled to the reasonable value of the services." *Heninger & Heninger, P.C. v. Davenport Bank & Tr. Co.*, 341 N.W.2d 43, 48 (Iowa 1983) (citing *Drake v. Block*, 74 N.W.2d 577, 580 (1956)).

As a starting point, Kollias had the burden of proving his claim for the reasonable value of his services. *See McFarlin*, 192 N.W. at 401; *see also Biedenfeld v. Est. of French*, No. 12-1577, 2013 WL 3271847, at *11 (Iowa Ct. App. June 26, 2013) (finding plaintiff "adduced no evidence of the reasonable value of his services, as required to recover under quantum meruit"). The district court was not satisfied with Kollias's proof. The court did not find his testimony trustworthy on (1) the proper hourly rate, (2) the number of hours he worked, or (3) the value of the materials he provided. We defer to the district court's credibility findings. *See Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 394 (Iowa 2010) ("The district court as the fact finder, determines witness credibility and the weight of the evidence as a whole, and we will not disturb the district court's findings if they are supported by substantial evidence." (citation omitted)).

After listening to testimony and reviewing the parties' exhibits, the district court found Kollias proved he worked 1364 hours on Ferguson's Hill.[12] As for an hourly rate, the court rejected Kollias's claim that $65 was reasonable. Instead, the court accepted the owners' view that a reasonable rate for his work was $40 per hour. Beyond his labor, the court found Kollias contributed $26,126.56 in millwork and $33,190.57 in other materials. The court set Kollias's total outlay at $113,877.13. From that amount, the court subtracted the $73,885 that Kollias acknowledges being paid by Cardis. Although vigorously contested by Kollias, the court determined Cardis paid Kollias the remaining $39,992.13 in cash.

We find substantial evidence in the record to support the district court's determinations. On appeal, Kollias rehashes his factual claims from trial. He challenges the district court's findings on the number of hours he worked, the industry standards on hourly rates, the tools and supplies he provided, as well as the amount he received in cash. Essentially, Kollias asks us to reweigh the proof, which we cannot do when reviewing for substantial evidence. *See Hendricks*, 609 N.W.2d at 490 (citation omitted). Instead, we construe the district court's findings "broadly and liberally." *Id.* "In case of doubt or ambiguity we construe them to uphold, rather than defeat, the judgment." *Id.*

On each point Kollias contests, the record backs the court's findings. On time spent, the court heard evidence Kollias never showed contemporaneous time

---

[12] Kollias offered an exhibit showing he worked 1680 hours on the project. The court found "Kollias failed to prove he performed 326 hours of the work reflected in his exhibits." While 1680 minus 326 equals 1354, the court found Kollias should receive compensation for 1364 hours of work. Because the ten-hour discrepancy is in Kollias's favor, we take no corrective action.

records to the owners. Several contractors noted his unpredictable presence at the site. And the owners offered evidence showing that others completed work Kollias claimed to perform. On the hourly rate, Gallego testified they would not have approved his work at $65 per hour because it was beyond their budget. As fact finder, the district court had a right to reject Kollias's reliance on trade magazines to calculate his hourly rate for trial. On the other hand, the court could accept Cardis's position, given his hiring of many other contractors, that $40 per hour was a reasonable rate. As for supplies, the court believed Kollias "clearly overreached" on his claim for materials and tools. After reviewing the documentation, the court "became convinced that Kollias had included costs for items not used on Ferguson's Hill and for many tools." We decline to tinker with those detailed findings.

Finally, we recognize the district court faced a difficult task in reconstructing the history of cash payments to Kollias. As the court noted, "Neither party appears to have contemporaneously accounted for the cash payments." And the court did not fully trust either parties' after-the-fact estimates.[13] To fill the void, the court considered evidence that "Kollias wanted cash because it would help him avoid any potential impact income might have on governmental benefits." The court also recalled "Cardis' non-party witnesses testified to instances in which they were present and Cardis was paying Kollias in cash." All things considered, we find the

_____

[13] Cardis offered two years' worth of bank documents to show the payments he made to Kollias. The court noted Cardis's reconstruction assumed "all or almost all significant cash withdrawals at any point when he would have been in a geographic location where he could pay Kollias were used to pay Kollias."

court's determination that the cash payments exceeded $39,992.13 found adequate support in the record.

The question is not whether the evidence would support a different finding, but whether it supports the finding actually made.  *See Raper v. State*, 688 N.W.2d 29, 36 (Iowa 2004).  When we "broadly and liberally" construe the district court's factual findings, we find substantial evidence to uphold its holding that Cardis paid Kollias for the reasonable value of his services and the market value of the materials he furnished.  The court properly entered judgment for Cardis and DeGallego on the quantum meruit claim.  For the same reasons, we affirm the dismissal of Kollias's application to foreclose mechanic's lien.

**AFFIRMED.**